

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

**271 Cadman Plaza East**
**Brooklyn, New York 11201**

June 11, 2012

The Honorable Nina Gershon
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

    Re:  United States v. Joshua Kestenbaum
           Criminal Docket No. 04-821 (NG)

Dear Judge Gershon:

      The government respectfully submits this letter with respect to the sentencing in the Violation of Probation proceeding in the above-captioned case, scheduled for July 10, 2012. For the reasons set forth below, the government respectfully requests that the Court sentence the defendant to a term of imprisonment within the Sentencing Guidelines range for the original offense of conviction. The Court found at the original sentencing on June 12, 2008 that the applicable Guidelines level was 31, which in Criminal History Category I carries a range of imprisonment of 108 to 135 months. The government also requests that the Court impose a restitution payment schedule of at least $10,000 per month, and require the defendant to pay a significant lump sum including, but not limited to, the $22,500 balance of the defendant's unpaid restitution obligation, which he was required to pay during the violation charge period.[1]

I.    Relevant Background

    A.    Underlying Crime and Conviction

      On September 28, 2004, the defendant pleaded guilty, pursuant to a cooperation plea agreement, to a single-count Information charging that, between January 1999 and July 2003, he and others conspired to commit bank fraud and wire fraud against Capital Factors, in violation of Title 18, United States Code,

---

    [1] The defendant has paid a total of $15,000 of the $37,500 in restitution he was required to pay since April 2011 pursuant to his $2,500 per month Court-ordered payment schedule.

Section 1349. The charges arose from a scheme perpetrated by the defendant to induce Capital Factors to lend funds to the defendant's businesses, Cosmopolitan Gem Corporation and its affiliate Colorcast, Inc., based on false accounts receivable, which the defendant provided via mail and wire. The defendant enlisted various individuals at other businesses to falsely verify invoices and confirm his businesses' accounts receivable, when in fact such invoices and accounts receivable were fabricated. The defendant's scheme caused Capital Factors to give approximately $30 million to the defendant's businesses under false pretenses.

On June 12, 2008, the defendant was sentenced. Because the defendant provided substantial assistance to the government in the prosecution of other individuals, the government filed a motion for a downward departure pursuant to U.S.S.G. §5K1.1. The Court imposed a sentence on the defendant of five years of probation, forfeiture in the amount of $2.5 million, and restitution in the amount of $11,159,447 plus interest.

As referenced in the government's submission of May 23, 2012, the Court at sentencing found the defendant's true financial situation to be opaque. A restitution obligation of $2,500 per month was imposed, but notably the Court stated that the defendant was "also to provide full financial disclosure to the Probation Department for purposes of assuring that restitution is made and that forfeiture is paid and that he is not getting himself into financial difficulties which might tempt him into further criminal activity." 6/12/08 Transcript (T) 26.

Unfortunately, the defendant gave into the temptation of further criminal activity. Far from providing full financial disclosure, to facilitate the commission of his admitted violation - the nonpayment of restitution - the defendant lied to U.S. Probation and the government about his assets and income, and purposefully structured his finances in a tangled web of obfuscating transactions.

B. Violation of Probation

On May 16, 2012, the defendant pleaded guilty to the third charge in the Violation of Probation Report filed by the U.S. Probation Office on February 28, 2012. This charge involves the non-payment and under-payment of the defendant's $2,500 monthly restitution obligation beginning in April 2011. The non-binding policy statements of the Sentencing Guidelines, per U.S.S.G. §§7B1.1(a)(3) & 7B1.4(a), recommend a custody term of 3-9 months for this violation.

3

Since shortly before the defendant pleaded guilty to the underlying crimes in this case, he has configured his finances in an elaborate scheme to hide income from the U.S. Probation Office, the U.S. Attorney's Office and the Court (and, it is presumed, from the tax authorities). After the government filed its March 10, 2011 motion requesting an increase in the defendant's restitution payments ("the government's restitution motion"), he deliberately and unilaterally decided to reduce and suspend his monthly $2,500 restitution payments, while claiming he had done so due to financial difficulties – claims that were completely fabricated. As described in further detail below, during the time period that the defendant was claiming financial distress due to Bake Me A Wish's ("BMAW") purported inability to pay him, he funneled at least $159,218.83 from BMAW to pay for his personal expenses. The defendant did this directly, and also by repaying family members' financial accounts from which he had already paid personal expenses, including his monthly rent of $6,250 for an apartment into which he had "downsized" in 2008 after moving from his $12,000/month apartment on Manhattan's Park Avenue. During this period, the defendant further received more than $26,000 in state and federal income tax refunds.

As set forth in the government's restitution motion, the defendant has continuously used BMAW as his personal piggy bank since the company's formation in 2004. Based on the defendant's commingling of business and personal funds, his continued transferring of company funds to himself and family members, his ability to earn income that is essentially tax-free (as a result of an unsubstantiated $1 million net operating loss stemming from his prior crime), and his continued receipt of significant financial support from his mother, the United States requested that the defendant be required to pay a lump sum of at least $500,000, and the greater of $10,000 per month, or 5% of BMAW's gross monthly sales, toward the unpaid portion of his $11,159,447 restitution judgment.

As also described in the government's restitution motion, in the first five years of operating BMAW (through the beginning of 2010), the defendant siphoned at least $530,508 out of the company for personal expenses and payments to family members. Additionally, the defendant spent over $200,000 during this period on meals[2] and entertainment, purported medical

---

[2] The defendant claimed virtually all of his meals as business expenses, including many meals supported by fabricated entries in a debit card log in which he described meals with

4

expenses,[3] personal legal expenses, and purported payroll checks to his wife and daughter.[4] In addition to the funds the defendant funneled from the company, the defendant started drawing an $8,100 monthly salary after he was sentenced in June 2008, which, according to the defendant, ceased when the government filed its restitution motion because BMAW could no longer afford to pay him.

Contrary to the defendant's claims of financial distress, he had more than sufficient funds to pay restitution during the one-year period after the government filed its motion. Based on the Financial Litigation Unit's continued investigation of the defendant's finances (including recent subpoenas issued for documents from the financial accounts of the defendant, his mother, and BMAW, as well as the deposition of the defendant's mother) and as described below, the defendant had access to and diverted at least $159,218.83 from BMAW in the year following the government's filing of its restitution motion, using the following scheme.

The defendant used a presigned book of blank checks given to him by his mother Hannah from her home equity line of credit to pay for portions of his rent, personal legal fees, and

---

individuals with whom he never dined. He also claimed 127 taxi fares as business expenses in 2008 and 2009 for purported cake deliveries. However, BMAW does not actually deliver the cakes it sells. BMAW's cakes are made and shipped from a bakery on Long Island.

[3] The defendant spent $48,000 of company funds in less than two years on purported medical expenses claiming that they were covered by an Internal Revenue Code Section 125 Cafeteria Plan. The plan, however, permitted him only to set aside up to $5,000 of his own salary (tax free) -- not the company's funds -- to pay for medical expenses.

[4] Wife Vivian and daughter Elizabeth received approximately $60,000 in payroll checks in 2008 and 2009. The government's investigation revealed that Elizabeth assisted with invoicing and customer service at BMAW but only for a period of approximately 5 months in 2008. No one could confirm that she provided any services to BMAW in 2009. Nor could anyone besides Vivian confirm that Vivian had ever provided any services for BMAW.

to make payments to his wife Vivian[5] in the amount of at least $68,740. He also used his mother's pre-signed home equity checks to pay $7,500 to BMAW and repay $3,600 to another home equity line of credit titled in his mother's name which was used by the defendant prior to the violation charge period. Over the course of the subject period, the defendant caused BMAW to repay $64,371.35 of his mother's home equity payments. In this way, the defendant funneled these funds through BMAW and his mother's home equity accounts in order to hide the funds from the government, Probation, and the Court.

Similarly, the defendant's mother allowed the defendant to use her credit card during the charged period (and previously) as long as he repaid his charges directly to the credit card bank. The defendant diverted $40,140.67 from BMAW during the subject period to pay for the charges he made on his mother's credit card.[6]

In addition to the payments diverted to his mother's accounts, the defendant received checks and/or electronically transferred money from BMAW to his personal checking account in the total amount of $25,311.71, and caused BMAW to pay $6,500 in personal legal expenses, $6,400 in "medical reimbursement" payments, $11,145.92 to his wife Vivian,[7] and $5,349.18 to

---

[5] We presume that Vivian continued to earn income of at least $6,000 per month from Waldman Publishing and family trust distributions during this time period.

[6] Of note, the government learned from its review of BMAW's bank account documents and its deposition of the defendant's daughter Hannah Kestenbaum that, in addition to the home equity and credit card accounts, the defendant previously had access to a checking account titled in Hannah's name that Hannah did not recognize at her deposition. Hannah was also unable to explain where the money came from that funded the account, but speculated that the funds may have come from the defendant's former jewelry business, Cosmopolitan Gem Corporation, which he used to commit the underlying crimes. Between 2006 and 2008, the defendant deposited $59,600 from this checking account into BMAW. The government has subpoenaed documents from the account; the bank's response is pending.

[7] Presumably, the defendant will claim that these checks to Vivian were payroll checks. As further described in the government's motion to increase the defendant's restitution payments, however, no one other than Vivian was able to confirm

American Express.[8]

As noted above, the defendant also received more than $26,000 in tax refunds from New York State and the Internal Revenue Service in July 2011 from his 2010 income tax filings. Although the defendant admitted in his response to the government's restitution motion to having recently received tax refunds that he used to pay $7,500 in restitution, he failed to mention that he had received the much greater sum of $26,333 in refund money ($9,000 from NY and $17,333 from IRS). Curiously, on July 8, 2011, the same day the defendant filed his response, he withdrew $17,750 from his bank account from the remainder of the funds. The government does not know what became of the $17,750 he withdrew, except that it was not used to pay restitution.

II. Argument

The defendant was engaged in a series of violations while under probationary supervision. These violations included not only the failure to pay the requisite monthly restitution payments - to which the defendant has pleaded guilty - but also a scheme to hide his true financial situation from U.S. Probation and the government and to lie repeatedly about his finances.

In light of the seriousness of the defendant's crime, the substantial benefit afforded him at sentencing, and his later refusal to make a clean break from financial fraud, the sentence on the defendant's violation of probation should be the sentence that he otherwise would have received in the absence of a §5K1.1 motion. That sentence should fall within the undisputed Sentencing Guidelines range of 108 to 135 months.

The Court enjoys broad discretion when sentencing a defendant for violations of probation. The pertinent statute provides:

---

that she provided any services to the company when she was previously receiving alleged payroll in 2008 and 2009.

[8] BMAW does not have a corporate credit card account. Presumably, the American Express payment was for the defendant's wife's credit card account.

>Revocation of probation.
>(a) Continuation or revocation.
>>-If violates a condition of probation at any time prior to the expiration or termination of the term of probation, the court may, after a hearing pursuant to Rule 32.1 of the Federal Rules of Criminal Procedure, and after considering the factors set forth in section 3553(a) to the extent that they are applicable-
>>
>>>(1) continue him on probation, with or without extending the term or modifying or enlarging the conditions; or
>>>
>>>(2) revoke the sentence of probation and resentence the defendant under subchapter A.

18 U.S.C. § 3565(a).

Subchapter A refers to 18 U.S.C. §§3551-3559, which are the general provisions of the United States Code applicable to criminal sentencing. United States v. Goffi, 446 F.3d 319, 322 (2d Cir. 2006). Consistent with this statutory provision, it is noted in the Sentencing Guidelines that "if the court finds that a defendant violated a condition of probation, the court may continue probation, with or without extending the term or modifying the conditions, or revoke probation and impose any other sentence that _initially_ could have been imposed." U.S.S.G. Ch.7, pt.A, intro. comment. 2(a), citing 18 U.S.C. §3565. (Emphasis added.)

In United States v. Verkhoglyad, 516 F.3d 122 (2d Cir. 2008), the Second Circuit affirmed this Court's imposition of a 57-month term of imprisonment for a violation of probation, notwithstanding the fact that the recommended Sentencing Guidelines range for the violation - illegal possession of controlled substances - was 5 to 11 months. In Verkhoglyad, the original guidelines range was 46 to 57 months. Noting that the original range "was advisory and not mandatory," this Court stated that the original range did "give rise to an appropriate sentencing range for this violation." Id. at 127. Like the defendant, Verkhoglyad had previously been sentenced pursuant to a cooperation agreement and a motion pursuant to §5K1.1, and had been granted a lenient sentence. (In fact, Verkhoglyad had previously been granted leniency on two convictions and a supervised release violation.)

8

Verkhoglyad's claim that his 57-month sentence on the violation of probation was "unreasonable" was rejected by the Second Circuit. The Circuit noted that a number of factors weighed strongly in favor of a higher sentence than that provided for in the probation violation guidelines set forth in U.S.S.G. §7B1.4. Specifically cited was application note 4 to that Guideline, which reads as follows:

> Where the original sentence was the result of a downward departure (e.g., as a reward for substantial assistance), or a charge reduction that resulted in a sentence below the guideline range applicable to the defendant's underlying conduct, an upward departure may be warranted.

Id.; Verkhoglyad, 516 F.3d at 129-30.

The Second Circuit noted that the sentence, among other things, reflected the fact that the defendant had betrayed the trust reflected in the prior lenient sentences granted to him. Verkhoglyad, 516 F.3d at 130. Moreover, the Circuit noted:

> it is important not to lose sight of the fact that it does not sanction *only* the breach of trust. Rather, it resentences the defendant for the crime of conviction mindful that he has breached the trust placed in him by a probationary sentence.

Id. at 130 n.6 (emphasis in original).

In the instant case, the great lengths the defendant has gone to to evade his $11 million restitution liability and the modest $2,500 monthly payment schedule initially imposed by the Court can only be viewed as a breach of the Court's trust. In short, this Court gave the defendant the opportunity to turn his life around, without incarceration, while making some effort to repay his victims. The Court trusted the defendant in placing him on probation, and the defendant violated that trust. He should suffer the appropriate consequences.

Indeed, at sentencing, the Court instructed the defendant that "[t]he best way to continue to show [contrition] is to recognize that if he's not in custody, he needs to be earning money so that he can pay back what he owes to the victim here." 6/12/08 T 27. Rather than showing contrition in working to the best of his ability to repay the victim of his crime, the

9

defendant has shown no regard for his victim nor remorse for his crime, and has instead gone to great and extravagant lengths to avoid paying the restitution judgment while continuing to spend lavishly on himself and his family.

III.     Conclusion

For the foregoing reasons, and based on the factors set forth in Section 3553(a), the government respectfully requests that the Court sentence the defendant within the original Sentencing Guidelines range of 108 to 135 months in prison, accompanied by an extended term of supervised release, to include a monthly restitution obligation in the amount of $10,000 or more, and a significant lump sum payment.

Respectfully submitted,

LORETTA E. LYNCH
United States Attorney
Eastern District of New York

By: _____
Ilene Jaroslaw
Bonni Perlin
Assistant U.S. Attorneys

cc:  Alan S. Lewis, Esq.

     U.S. Probation Officer Carrie Barona