# CARTER LEDYARD & MILBURN LLP
*Counselors at Law*

Alan S. Lewis
Partner
•
*Direct Dial: 212-238-8647*
*E-mail: lewis@clm.com*

*2 Wall Street*
*New York, NY 10005-2072*
•
*Tel (212) 732-3200*
*Fax (212) 732-3232*

*570 Lexington Avenue*
*New York, NY 10022-6856*
*(212) 371-2720*

July 17, 2012

**VIA ECF & REGULAR MAIL**

The Honorable Nina Gershon
United States District Judge
Eastern District of New York
225 Cadman Plaza
Brooklyn, NY 11201

> Re: *United States v. Joshua Kestenbaum*
> 04 CR 821 (NG)

Dear Judge Gershon:

    In the wake of last week's violation of probation hearing, I write to make two requests related to the Court's consideration of the charges at issue. First, in the context of the false statements charge (Charge One), I ask for permission to submit a post-hearing brief on the legal element of "materiality." Second, and related to but distinct from that first request, I also seek a remedy for the government's significant deviation, at trial, from the case it said that it *would* present. As explained below, the government abandoned reliance on large parts of the case it summarized in its pre-hearing letters (dated June 11 and June 21) and summary Exhibit 3, in favor of theories it expressed nowhere until the very end of the trial.

### Post-Hearing Submissions Were Anticipated

    Prior to any trial testimony, I cited *United States v. Kungys*, 485 U.S. 759, to the Court as the leading case defining the "materiality" element of statutes, like 18 U.S.C. § 1001, that include an express materiality element. *See* Hearing Transcript ("HR") at 47-48. Prior to making a summation, I advised the Court that I was "concerned" by the Court's request that I be required to sum up before I had completed the submission of defense counter-designations from the deposition. *See* HR at 315 ("I will be summing up at a time when not quite all of the evidence is in."). The Court ruled that I should "tell me what your views of the case are *at this point*" and further stated that "if you want to brief anything" "after the summations" that this was a subject we could raise "when the summations have concluded". HR at 316.

The Honorable Nina Gershon
July 17, 2012
Page 2

Following the government's summation, the Court asked the government if its "view on the law of materiality" is "different" or the same as the defense. Government counsel answered with its opinion that the standard had been met "because it was a condition of probation that the defendant truthfully report his financial situation." HR at 408. During the defense summation, I again raised the subject of the *Kungys* materiality standard. The Court asked me if statements made by a person under supervision about his assets [assumed to be false for the purpose of the Court's question] were automatically material if told to the Probation Department. I briefly stated that materiality has to be viewed "through the lens of what that term means under statutes like 1001" and expressed that the issue "may be a better subject for briefing" than summations. HR at 413. In any event, two of the five statements (numbers 3 and 4) alleged to be materially false were *not* made to Probation.

Given that materiality is an element of the first charge and the constricted discussion of the issue during summations, I ask to submit a post-hearing brief on this subject. My brief would explain why the government's materiality argument – that the challenged statements were material "because it was a condition of probation that the defendant" report on his finances makes an assumption about materiality that the law does not permit. It is improper to simply assume that a statement made in a financial report to the Probation Department is material, because materiality requires that the statement in question have been "predictably" capable of affecting an official decision. *Kungys* at 771. The "official decision" should be defined here as the one the Court identified at sentencing – whether the Court would increase Mr. Kestenbaum's restitution after receipt of more complete financial information from Mr. Kestenbaum about his finances. To define the official decision more broadly as whether to bring any violation of probation proceeding based on any misstatement about anything to Probation is circular, effectively converts any misstatement to the Probation Department into one that is automatically treated as material, and would thereby make the materiality element of the statute illusory. In short, the general requirement to report on personal finances to Probation does *not* render "material", within the definition of 18 U.S.C. § 1001, anything and everything included in the financial part of the report to Probation.

### There Were Several Differences Between the Government's Case, as Laid Out in Its Bill of Particulars and Other Pre-Trial Submissions, and the Case It Presented at Trial

Prior to trial, I repeatedly emphasized the enormity of the documentary volume in support of requests for an adjournment sufficient to enable a meaningful review of the documents. *See* July 3 transcript of court proceedings and letters from Alan Lewis dated July 3 and July 6. The Court denied those applications, emphasizing the roadmap the government had provided to its case and which the Court, naturally, expected the government to follow. "[Y]ou already have their bill of particulars, which is very detailed, much more than anyone normally gets in a case of this kind . . ." (HR at 13). Before the trial began, the government had indeed provided the roadmap the Court (and the defense) expected the government to follow, in the form of three documents: (1) a letter dated June 11, 2012 that laid out the government's proffered proof of Mr.

7052191.1

The Honorable Nina Gershon
July 17, 2012
Page 3

Kestenbaum's purported ability to pay [relevant to Charge Three]; (2) a letter dated June 21, 2012 that particularized the government's false statements case [relevant to Charge One]; and (3) Government Exhibit Three (provided to the Court and counsel three calendar days before the trial began) whose content is virtually identical to the June 11 and June 21 letters. Reinforcing the government's expressed reliance on the two letters (and Exhibit 3) as including the guts of its case, the government designated the June 11 and June 21 letters as its opening statement. Specifically, the government told the Court it would "rely on the letters" with respect to both "the defendant's ability to pay" and the false statements charge. HR at 16-17.

Despite these representations, the government effectively abandoned most of the evidence it said it would rely upon to prove its case. This conclusion is evident from a comparison of evidence the government said it would rely upon in its filings just prior to trial with the different evidence it then sought to rely upon, particularly with respect to Charge Three.

The key dispute with respect to Charge Three is of course whether Mr. Kestenbaum was able to pay restitution during the period of time he did not do so. The government's June 11 letter represented that its "ability to pay" case rested upon evidence that Mr. Kestenbaum "funneled at least $159,218.83 from BMAW to pay for his personal expenses," "during the time period the defendant was claiming financial difficulties". June 11 Letter at 3, 4 (claiming Mr. Kestenbaum "*diverted* at least $159,218.63 from BMAW [in the year described as the charge period]. The government's June 11 letter, and the last three pages of Government Exhibit 3, broke the purported funneling down into all of the discrete sub-parts that add up to the government's number. Those subparts, according to the government's June 11 letter, were:

    a)    BMAW's receipt, over time, of money from Mr. Kestenbaum's relatives, mainly Hannah Kestenbaum, followed by BMAW's payment of $64,371.55 into Hannah's checking account, followed by the use of that money (and an additional $13,000 from Hannah's account) by Vivian and Joshua Kestenbaum for such things as rent. June 11 Letter at 5. This is the *only* aspect of the Mr. Kestenbaum purported "funneling" from BMAW" during the Charge Three time period, in any way referenced in the government's June 11 letter, that it also relied upon at trial. But as explained below, this aspect of the government's Charge Three case was and is irretrievably intertwined with a brand new claim, advanced by the government for the first time mid-trial, that the above described transfers [from, to and from Hannah] were "money laundering" (and taxable "income") designed to obscure what the government labeled as "conversion."

    b)    BMAW's payments of $40,140.67 by BMAW toward a charge card account of Hannah Kestenbaum; (June 11 Letter at 5);

7052191.1

The Honorable Nina Gershon
July 17, 2012
Page 4

    c)      BMAW's payment of $5,349.18 toward an American Express card account of Vivian Kestenbaum; (June 11 Letter at 5-6);

    d)      Mr. Kestenbaum's transfers "from BMAW to his personal checking account in the total amount of $25,311.71." (June 11 Letter at 5);

    e)      BMAW's payment of $6,500 in legal expenses related to Mr. Kestenbaum's case. (June 11 Letter at 5);

    f)      BMAW's reimbursement to Mr. Kestenbaum of $6,400 of health care expenses (June 11 Letter at 5);

    g)      BMAW's Payment of on-the-books wages of $11,145.92 to Vivian Kestenbaum. (June 11 Letter at 5).

The part of Government Exhibit 3 that describes Mr. Kestenbaum's purported "ability to pay" is essentially identical to the June 11 letter. The money described as "funneled" or "diverted" by Mr. Kestenbaum from BMAW in the June 11 letter – paragraphs a through g above – is further broken down, in Government Exhibit 3, into specific payments, by month.[1] The only difference between the content of Exhibit 3 and the June 11 letter is that Exhibit 3 includes <u>one</u> more transaction, as purported proof of Mr. Kestenbaum's "funneling", namely BMAW's payment of $2,500 to David Kestenbaum in March, 2011.

My summation, which I will not otherwise characterize in this letter, detailed the government's failure to present proof of most of the things described in its June 11 letter as examples of Mr. Kestenbaum "funneling" BMAW's money. Indeed, the summation given by government counsel made no claim that the items summarized in b through g above, were proof of Mr. Kestenbaum's ability to pay during the charge period.

And while the government did rely, for proof of Mr. Kestenbaum's ability to pay, on the transfers from BMAW to Hannah described in "a" above – the government's case changed into a form that I could not have and did not anticipate. Specifically, the government claimed that "the transfers from Hannah Kestenbaum were an "unauthorized conversion" (HR at 399), that this money was "income" (HR at 402) and the transferred money was subsequently "laundered" (HR at 401) to conceal that its source was this criminal conversion. In this way, the government put forth a legal theory, at trial, not mentioned in its pre-trial disclosures or summary exhibit.

---

[1] For example, the $40,140.67 identified in the June 11 letter as the amount BMAW paid toward a credit card in the name of Hannah Kestenbaum is broken down, in Exhibit 3, to specific payments made in March, April, July, August, September, and December, 2011 and February, 2012.

The Honorable Nina Gershon
July 17, 2012
Page 5

The government came up with other new theories at trial for its "ability to pay" claim. Specifically, it claimed that the mere fact that Josh and Vivian Kestenbaum's monthly rent is now $6,400 (it was $6,200 at the beginning of the charge period) means that Mr. Kestenbaum had the ability to pay monthly restitution after the loss of his salary. *See* HR at 393 (government counsel claiming that the amount of rent alone proves Mr. Kestenbaum's ability to pay and describing any different perspective as "bizarre" and "untenable"). Had the government included this claim in its June 11 letter or Exhibit 3, Mr. Kestenbaum would likely have called the most knowledgeable witness on this subject, Vivian Kestenbaum, to testify to the circumstances surrounding the renting of that apartment.

In a similar vein, I did not anticipate the government would make a claim that Mr. Kestenbaum stole the money given to him by his mother for him to give to his schizophrenic brother, Elihu. There was no hint of this claim in the government's pre-trial submissions. The claim is absolutely and demonstrably false. What happened is that Mr. Kestenbaum sometimes deposited the checks given to him by his mother to pay his mother's HELOC interest – but that Mr. Kestenbaum used other money, mainly cash given to him by his wife, to fully pay Elihu his $225 weekly amount. Mr. Kestenbaum *never* failed to give Elihu his money. Respectfully, the Court should not consider these ninth inning allegations, or at the very least, should give Mr. Kestenbaum a reasonable opportunity to rebut them. This allegation can be rebutted, conclusively, with testimony from Elihu Kestenbaum, but I perceived no reason to interview him before trial, and could not have done so late in the trial, after this allegation emerged, given the various other things that I was required to do, including the ongoing preparation of other witnesses to testify and the outlining of a summation.

In sum, to a significant extent the government emphasized legal theories and evidence not mentioned in its pre-trial submissions that purported to outline its case. The remedy should be a dismissal of Charge Three. Alternatively, if this request is denied, the Court should consider only whether the government proved the case it described in its June 11 letter, or finally, should at the very least permit Mr. Kestenbaum to present additional evidence to rebut the aspects of the government's case that were completely absent from its pre-trial written description of that case.[2]

The above described deviation from pre-trial notices to trial evidence spilled over into the false statements case. For example, the government relied on the same transfers from BMAW (of $6,250 each) that it pointed to for "ability to pay" as proof of the falsity of Mr. Kestenbaum's December, 2010 and January, 2011 MSRs. If those funds were not "converted" from Hannah and then "laundered", as the government puts it, it has offered no explanation for those funds other than the defense explanation: the funds were made available by Hannah to Josh, he used

---

[2] The additional evidence Mr. Kestenbaum would offer might include: a) testimony of a tax expert that the money from Hannah purportedly "laundered" was not income to Mr. Kestenbaum,; b) the testimony of Elihu Kestenbaum that Josh never failed to give him his weekly stipend; and c) testimony from Vivian Kestenbaum about the apartment she and Mr. Kestenbaum rent.

7052191.1

The Honorable Nina Gershon
July 17, 2012
Page 6

them for a while to keep BMAW afloat and then used the funds for the purpose Hannah originally intended as she testified at her deposition – for Vivian to use toward expenses such as rent.

In sum, if the court denies the application to dismiss, we respectfully request that the Court not consider the government's claims advanced for the first time at trial – not included anywhere in the June 11 and 21 letters or Exhibit 3 – and instead measure the government's proof against the case it *said* it would present.

Respectfully submitted,

*[signature]*

Alan S. Lewis

ASL:bp

cc: **VIA ECF**

A.U.S.A.s Ilene Jaroslaw and Bonni J. Perlin

7052191.1